NOTICE
Decision filed 07/24/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260194-U

NOS. 5-26-0194, 5-26-0195 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* REMBRANDT H. and ELYZABETH H., Minors | ) ) ) | Appeal from the Circuit Court of Champaign County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 25-JA-53, 25-JA-54 |
| Marvin H., | ) ) ) | Honorable Colleen M. Ramais, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's dispositional order making the minors wards of the court is affirmed where the trial court's findings were not against the manifest weight of the evidence.

¶ 2    In this consolidated appeal, respondent, Marvin H. (Father), appeals the trial court's March 3, 2026, dispositional order making the minors wards of the court. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Adjudicatory Hearing

¶ 5     On June 17, 2025, the State filed petitions for adjudication of wardship alleging that

Father's children, Rembrandt H. (R.H.) (born July 2013) and Elyzabeth H. (E.H.) (born March

2017), were neglected based on an injurious environment under section 2-3(1)(b) of the Juvenile

Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2024)). Count I was based

on domestic violence between Father and the minors' mother, Elyzabeth S. (Mother),[1] while count

II was based on Father's mental health. Later that year, on November 10, 2025, the State filed a

supplemental petition for each minor, adding count III based on substance abuse by one or both

parents.

¶ 6     The matter proceeded to an adjudicatory hearing beginning on December 9, 2025. Olyvia

H., Father and Mother's adult daughter, testified that she moved out of the family home on

November 9, 2024, after Father allegedly tried to commit suicide. After work that day, Olyvia was

in her room when she heard the minors yelling, "call the cops," "daddy's dying." Olyvia went to

the basement, where she saw Father lying on the floor. According to Olyvia, he "had tried to

commit suicide [by] hanging himself." Mother was in the basement as well, drunk and looking

"completely beat up, like swollen beyond recognition." Her "face was purple" and "[h]er eyes

were bloodshot." Olyvia claimed Mother "was swollen on her forehead, on her cheeks, beyond

recognition." The minors were also there crying, leading Olyvia to send them upstairs to her

bedroom.

¶ 7     After Father got up from the floor, he ran outside "looking for something to hit himself

with," ultimately finding a fishing pole that he began "poking himself with." Olyvia followed him

---

[1]Mother is not a party to this appeal.

to "a small *** building right next to [their] house" where she found him crying, "on his hands and knees, *** talking to God, asking why he was the way he was." Olyvia eventually called the police because she needed "a safe adult *** to handle the situation," and neither of her parents were in a position to do so. Olyvia's testimony further revealed that the night before, her parents had been arguing about alcohol, cheating, and "a lot of paranoia," while the minors were present. Part of the argument stemmed from Mother buying alcohol, notwithstanding that Father was a recovering alcoholic. Olyvia even hid a bottle of alcohol at Father's request, but later discovered the bottle was missing. That same night, Mother "kicked the dry wall in," a common occurrence in the home. Olyvia also saw her parents "[p]hysically fighting" and "pushing each other" while the minors were present. This, too, was a common occurrence.

¶ 8    Following the incident on November 9, 2024, Olyvia obtained an order of protection (OP) against her parents. She eventually got the police and Department of Children and Family Services (DCFS) involved. Olyvia stayed at her aunt's house for the next couple of weeks after which she told her parents that she did not "feel safe coming back" to the family home.[2] According to Olyvia, E.H. told her about a domestic incident between her parents that occurred in March 2025. The minors were in the car with Father and Mother when they began "fighting over a ring that [Father] was wearing." The argument escalated, and Mother "grabbed the steering wheel" while Father was driving, causing the car to swerve. Father then "punched" Mother "to get her to stop." Olyvia admitted, however, that she never asked her parents about the incident.

¶ 9    Regarding corporal punishment, Olyvia testified that her parents struck her in the past, as well as the minors. Olyvia claimed they only struck her once when she refused to do the dishes,

_____

[2]Father later testified that, at the time of the adjudicatory hearing, Olyvia was still living with her aunt. According to Father, after Olyvia testified, she and some relatives, including her aunt, broke into Father's house and took some of his possessions. Father subsequently called the police.

3

but they struck the minors on "multiple" occasions "[w]henever there was a disciplinary action to be taken." Olyvia discussed Father's mental health and substance abuse issues with him on multiple occasions, noting that he suffered from post-traumatic stress disorder (PTSD) and depression that he claimed were "caused by [Mother]." He took medication for these issues. Besides drinking, Father also "smok[ed] weed," which Olyvia had observed. According to Olyvia, she and her parents had not discussed what to do if Father had a mental health crisis.

¶ 10 Mother likewise discussed her own mental health and substance abuse issues with Olyvia. While Olyvia never witnessed her mother smoking weed, she knew "she had edibles in the house." Mother claimed the edibles helped "her relax before school" and "sleep." On one occasion, Mother showed Olyvia a bottle of alcohol and "over-the-counter Tylenol or something," and said, "this is what I'm going to do."

¶ 11 During cross-examination, Olyvia was asked about some prior inconsistent testimony concerning the alleged domestic violence between Father and Mother. Father's counsel highlighted that at Olyvia's order of protection hearing in late 2024, Olyvia testified that she had never seen Father hit Mother, contrary to her current testimony that she saw her parents "[p]hysically fighting" and "pushing each other" on the night of November 8, 2024, something that had happened on multiple occasions (see *supra* ¶ 7). On redirect, Olyvia clarified that she distinguished between two levels of physical violence concerning her parents, stating:

> "When I was younger[,] they would try to teach us how to fight and how to defend ourselves. I would wrestle with my dad sometimes, but there were times when I was crying because I felt like I—like I was being strangled, and I couldn't breathe. And you know, there's a point where it's playing or training, if you want to call it [that], and there's points when it's not. And there were points when my parents were angry at each other, and would

4

push each other, and shove each other. My mom usually ma[de] the first throw, and my dad would restrain her. I guess that's where I would call it hitting, is if he's pushing her; but I should clarify that that was pushing, not hitting."

As will be discussed more below, the family exercised together, including boxing with each other as part of their workouts.

¶ 12    Next, Jeffrey Myers, an asset protection manager at a Meijer store in Champaign, testified regarding an incident at the store on July 14, 2025, involving "shoplifters stealing a large amount of liquor." Myers and another manager stopped the male shoplifter, who then left the cart and exited the store. Myers called the police, while following the man outside. He told two of the store's detectives to "deal with the *** female, who was trying to go out the general merchandise doors." Meanwhile, a second man, who Myers identified as Father, approached Myers in the parking lot yelling and screaming, "saying he was just looking out for his brother" and "talking about [how] he was *** in the Army, and [had] lost people." Father then "punched" Myers, knocking his glasses off. Myers did not need medical attention, but he did report the incident to police. Myers did not remember seeing any children present, but after reviewing video footage of the incident, he recalled "seeing two or three children that [Father and the female] left with."

¶ 13    Officer Yaleina Anaya of the Rantoul Police Department testified that on November 9, 2024, she responded to Father and Mother's residence for a "suicide by hanging." She spoke to Mother, who was sitting in a vehicle with her head on the steering wheel. Officer Anaya observed "swelling" and "bruises around both of her eyes." While Mother first reported that her eyes were swollen from crying, she later claimed that her injuries were from Father "hitting her throughout the night." Mother expressed concern about Father since he had been "struggling with PTSD due to his prior military service." She then reiterated that Father "had hit her" and showed Officer

5

Anaya another bruise on her hand. Mother was not sure how she got the bruise but indicated "she may have hit [Father]." She did not let Officer Anaya photograph her injuries. Officer Anaya believed Mother was under the influence because she smelled like alcohol and indicated she had been drinking and arguing with Father the night before.[3]

¶ 14    Patrol Sergeant Kyle Gregg of the Rantoul Police Department testified that around 11 p.m. on November 9, 2024, Mother called dispatch, asking why officers were patrolling around her house. She denied being at the residence, indicating a neighbor had called and told her that officers were "continually driving by" her house. Sergeant Gregg explained to her that officers patrolled everywhere in the village and that he did not control their route. Mother mentioned that Father had a PTSD episode earlier in the night, then "repeatedly said that he had not assaulted her." Sergeant Gregg asked Mother where Father was, but she had not spoken to him, speculating "he was possibly somewhere in the Danville area with friends." Sergeant Gregg then asked Mother if she wanted to recant her earlier statements to police that Father had assaulted her, but she "just continued asking why officers were driving around the neighborhood."

¶ 15    Officer Johnathan Grice of the Rantoul Police Department testified that on November 9, 2024, he was dispatched to Father and Mother's residence for a reported suicide attempt, but he believed it was really a "domestic incident" that had occurred between them. Officer Grice suspected that Mother had been drinking because she "smelled strongly of an alcohol-based beverage." Additionally, her eyes were "discolored and swollen." Mother explained that Father "believed she was cheating on [him]" and had hit her. However, she later said that Father had tried

---

[3]Without any objection, Officer Anaya referred to a police report she wrote on November 9, 2024, to refresh her recollection. Specifically, that Mother claimed she had purchased alcohol the night before and that she and Father had been drinking since approximately 10 p.m. that night until Officer Anaya arrived at their residence the following afternoon.

to hang himself, not beat her up.[4] Officer Grice found an "ethernet cord" with a "six-inch *** loop *** hanging from a flimsy *** pipe in the rafters" in the basement. However, he did not observe any strangulation marks on Father's neck. He noted that children were present at the scene, but he did not speak to them. When Officer Grice interviewed Mother away from the home later that day, she claimed that she was "trying to lift [Father] up" during his suicide attempt and "that's when he struck her multiple times."

¶ 16    Officer Grice also spoke to Father, who had dried mud on his arms and knees. Father claimed he "freaked *** out" and "was having a mental health episode." Regarding the mud on his arms and knees, Father explained he had been outside "praying *** or talking to God." Further, this was not his first PTSD episode; he had five or six other episodes in the past.

¶ 17    Tatiana Marshbanks, a DCFS investigator, testified that in March 2025, she was assigned to investigate allegations of neglect to the minors based on possible domestic and substance abuse between their parents. According to Marshbanks, R.H. claimed that his parents did not "typically fight" but they yelled and argued. Additionally, R.H. had observed "marks *** or bruising to [Mother's] head" in the past. E.H. spoke to Marshbanks about the March 2025 incident in the car wherein she claimed that Mother "grabbed the steering wheel" and Father "backhanded [Mother] while they were driving." E.H. claimed her mother was hurt and had to be seen by a doctor.

¶ 18    Marshbanks also spoke to Mother about the March 2025 incident. According to Mother, the family was driving on spring break when they almost hit a deer. Mother "went into the windshield," which was "how she got the injuries to her head, and *** her hand." Marshbanks spoke to Mother about the November 9, 2024, incident as well. Mother claimed she had tried to stop Father from committing suicide, "and in the process of doing so his body seized and fell on

---

[4]Without objection, Officer Grice's recollection was refreshed with a police report he authored regarding the incident on November 9, 2024, as to what Mother had told him that day.

her, causing her injuries." Following that incident, the minors were briefly removed from the home as there were many concerns about domestic violence between Father and Mother.

¶ 19    Marshbanks spoke to Father, who essentially repeated the same information as Mother concerning the March 2025 driving incident. Father, however, added that Mother was not wearing a seatbelt, and therefore she hit the windshield when he slammed on the brakes. Father also admitted that he used marijuana, and, on special occasions, he used cocaine. Following a drug test, Father tested positive for both marijuana and cocaine. Additionally, Father stated this was the first time police were called to the home, that it was not a domestic violence incident, and that he was a combat veteran suffering from PTSD. Father claimed he was receiving mental health treatment from Veteran Affairs (VA) in Danville, but he would not sign a consent form to confirm such treatment. Father further claimed he was taking medication for his mental health issues. When Marshbanks met with Father toward the end of her investigation, she believed he was under the influence because he was "all over the place" and "sweating profusely." He would "talk to [her] straight," then suddenly be "upset, crying, [and] irate."

¶ 20    Marshbanks ultimately found that the allegations in this case indicated neglect based on drug use and positive test results, as well as Father's own admission that he used drugs, and E.H.'s admission of domestic violence between her parents. Following Marshbanks' testimony, a recess was taken.

¶ 21    When court resumed on February 10, 2026, Father was called to testify. He stated that on the night of November 8, 2024, he and Mother were celebrating their anniversary. They had been "intimate" that night and woke up the next morning "still celebrating." When they woke up, Father "already had a rope around [his] neck" from "experimental sex" the night before. Father stated, "And the next minute, she—I was cutting myself down from a rope, and she was—she had been

8

holding me up." Father claimed he had never tried anything like this before and did not plan to commit suicide, stating: "[I]t wasn't planned. It wasn't organized." Rather, "it was something from waking up in the morning *** and taking a shot of alcohol. Just that—it was just a bad combination." Father maintained that he did not hit Mother and that her injuries were the result of him seizing or convulsing while he was hanging and she was holding him up.

¶ 22    Additionally, Father and Mother boxed together, consensually, as part of their workouts. He acknowledged they would hit each other while boxing, sometimes resulting in injuries, albeit rarely. Father learned to box in the military, then later taught Mother and their three children. He denied ever strangling Olyvia while boxing, and claimed he never had problems disciplining Olyvia until she got older and started making bad decisions.

¶ 23    Father suffered from nightmares and took medication to help dull them at night. That night, however, he was not on his medication. Father claimed he had been weaning off his medication due to concerns about side effects, and he had been reaching out to his therapist to try and find alternative medication. Father had been dealing with mental health issues since 2012, and he was diagnosed with PTSD in 2022. He had been working on these issues with a therapist at the VA hospital's mental health clinic. Moreover, Father told his family that if he was having a mental health episode, to call 988, the mental health hotline. When asked why he did not remember trying to hang himself, Father speculated that it was due to one of his recurring dreams where "Saddam Hussein [is] hanging from a statue, and it's coming down." He stated: "I'm assuming that's probably a dream I had. That's probably something that was just fuzzy in my head," acknowledging the "alcohol didn't help."

¶ 24    Following the November 9, 2024, incident, the minors were taken to their aunt's home, while Mother stayed with a coworker, Kerry Hanson, who was a mandated reporter. Hanson called

9

DCFS about the incident. At some point, a DCFS caseworker visited Father and Mother, asking if they "needed services." They declined. Father explained they were trying to help "reduce [the worker's] caseload," and told her they would "get services" and "family therapy" as "soon as Olyvia [got] home." Father further testified that since the incident, he had been seeing a psychiatrist and taking a different medication that was less "harm[ful] to [his] body." He was current on all medications and had also started alternative treatments, like magnetic therapy. He was currently seeing a psychologist through the VA on a "call basis" and receiving mental health counseling at Rosecrance. Additionally, Father and Mother went to couples counseling at Family Advocacy Center in Champaign.

¶ 25 Although Father claimed he rarely consumed alcohol since the November 9, 2024, incident, he acknowledged that the day before he testified, in the presence of the minors, Officer Grice ticketed him for illegal transportation of alcohol, specifically, "two empty beer cans." Father claimed he had a drink earlier that day with his mother at Chili's Restaurant to celebrate her being "cancer free." According to Father, Officer Grice had been "constantly harassing" him since November 9, 2024.[5]

¶ 26 Mother's testimony was largely consistent with Father's account of what happened on November 9, 2024, and the events preceding it. Mother added that she and Father woke up in the basement, where their bedroom was located, and started doing laundry. Father woke up with a noose around his neck from their experimental sex the night before. Mother went upstairs to use the bathroom, then came back downstairs and found Father trying to hang himself. She "tried to *** lift him [up] to release the pressure that was around his neck." His body subsequently "started shaking, [and] convulsing," which, eventually, knocked her over. She called the minors to help get

---

[5]Father further claimed that during the ticketing incident, Officer Grice made a comment about Father "beat[ing]" up his wife.

Father down. R.H. tried to cut Father down but was too short, so Father "grabbed the knife out of [R.H.'s] hand and cut himself down." Mother got injured while she was holding Father up; he did not intentionally hit her. She emphasized that Father had "never hit [her]." She also acknowledged they would box, consensually, sometimes, adding that they both owned boxing gloves.

¶ 27    Mother stated that she had been with Father for nearly 20 years, and he suffered from night terrors the entire time. Father had been on and off medication during their relationship, and he only drank on occasion until the 2020 COVID-19 pandemic, when he began having problems with alcohol. Mother also agreed with Father's account of the March 2025 driving incident wherein he allegedly slammed on the brakes to avoid hitting a deer, causing her to hit the windshield and suffer some injuries. She eventually went to a local medical clinic when her injuries did not go away.

¶ 28    After hearing arguments from the parties, the trial court found that the State failed to prove by a preponderance of the evidence count I of the petition that was based on domestic violence between Father and Mother. The court, however, found that the State proved counts II and III of the petition based on Father's mental health and substance abuse, respectively. In reaching its conclusion, the court stated that it found Olyvia's testimony credible "in terms of seeing her parents drink, the amount, the amount that they drank that night, how inebriated they were, [and] the fact that *** [Father] asked her to hide a bottle of *** vodka in her room that night." The court entered a written adjudicatory order the same day, February 10, 2026.

¶ 29                              B. Dispositional Hearing

¶ 30    The case proceeded to a dispositional hearing on March 3, 2026, before a different trial court judge.[6] The trial court indicated it received and reviewed DCFS's dispositional report. That

---

[6]The adjudicatory hearing was before the Honorable Robert Jacobson, while the dispositional hearing was before the Honorable Colleen Ramais.

report revealed, as relevant here, that Father and Mother met in college almost 20 years ago at Eastern Illinois University following Father's active duty in the Navy. Father received a bachelor's degree in fine art, while Mother received a bachelor's degree in elementary education and a master's degree in art education. Father and Mother owned their home and were able to meet the financial needs of their family. They were, however, undergoing mortgage restructuring due, in part, to some financial hardships from attorney fees in this case. Additionally, Father's mother lived with the family.

¶ 31　Father was receiving federal disability assistance and was working on obtaining state disability as well. Mother was a tenured Science, Technology, Engineering, Arts, and Mathematics (STEAM) teacher in the Rantoul City School District. At the time of the report, Father remained in the family home, "which both [Father] and [Mother] appreciate[d] because it allow[ed] them to continue their desired family structure of always having one parent available for the family." Further, both parents experienced childhood trauma. Due to the trauma, Mother asked Father to teach "her to defend herself."

¶ 32　After DCFS opened this case, Mother "briefly sought therapy services" and had been taking an anti-depressant medication. According to Mother, her family does not speak to her due to their "racial bias" against Father. Mother described a daily family routine, consisting of her and Father exercising together before getting the children up and ready for school. Father would then make breakfast for the family to eat together, before dropping the kids off at school. After school, the family would eat together, followed by Father and Mother helping the children with their homework.

¶ 33　Father and Mother had cooperated with their intact caseworkers and kept the workers informed of any household changes. They had also consistently complied "with providing releases

12

of information to service providers and other professionals." Father and Mother completed weekly random drug screenings during the first 90 days of the case being opened. The screenings were subsequently reduced to twice per month. While Father regularly tested positive for THC, and once each for cocaine and alcohol, he "present[ed] and behave[d] in a consistent manner." Further, neither of the children "have reported seeing their father being intoxicated or under the influence," nor "have [they] stated they feel unsafe in their home environment or when interacting with their father." The report noted that despite Father's positive test results, Mother maintained sobriety "throughout all her random drug screens"; thus, there was a sober caregiver present for the minors. Both parents also completed a parenting course through Family Advocacy Center in Champaign County. Father attempted to enroll in a partner abuse program, but he was not allowed to due to some apparent miscommunication between DCFS and Prevention and Treatment Services (PATS). Additionally, Father obtained counseling services and was currently receiving mental health services from the VA in Danville. He shared his medical records with his intact caseworker.

¶ 34    Father suffered from tinnitus in his left ear and had hearing aids for both ears. Additionally, he was diagnosed with PTSD, anxiety disorder, insomnia, and chronic fatigue from insomnia. He was prescribed medication "for mood and sleeping." Father had two assault charges with no convictions. However, he maintained involvement with his recommended services and had begun seeking additional services outside of his intact case.

¶ 35    The report further revealed that R.H., currently in middle school, excelled in school and music. He participated in the school band and played percussion. Father and Mother have shown support for R.H.'s musical interests and talents, and they regularly attended his performances. Additionally, they "bought guitars for the family to learn an instrument together." R.H. "report[ed] no concerns living with his parents and sister" and could demonstrate how much his parents "love

13

and care for him," even when he was in trouble, which was rare. Further, he denied witnessing any substance or domestic abuse between his parents, and he reported "feeling comfortable and safe in his home with his mother and father." R.H. participated in weekly therapy sessions at Rosecrance.

¶ 36 E.H., currently in elementary school, also excelled in school and enjoyed it. She reported "no concern living with her parents and brother" and could "demonstrate her perception of how she feels her parents love and care for her, both in and out of trouble." Like her brother, E.H. attended weekly therapy sessions at Rosecrance. E.H. does not understand why DCFS was involved with her family. She "love[s] her parents and feels her parents love and care for her, even when they are upset with her or she is in trouble."

¶ 37 Following the investigation, DCFS recommended that Father and Mother maintain custody of the minors, but that guardianship be granted to DCFS. Jordyn Hayes, the family's caseworker, testified that it was a difficult decision, but ultimately, DCFS recommended that guardianship be granted to DCFS due to "there being concerns of the positive drug screen." Hayes stated, "that was the ultimate tilt towards the guardianship" recommendation.[7] DCFS noted no safety concerns were present and that interactions between the parents and minors were loving and respectful. Further, DCFS noted no concerns between the parents, and that Mother did "not display behavior associated with a domestic violence survivor." While DCFS acknowledged the severity of Father's positive drug screen results for cocaine and alcohol, it noted those concerns "have been addressed with [Father] both individually and with [Mother] present." Additionally, Mother "remains a sober, willing and able caregiver who is present for the children." Finally, DCFS recommended that both parents continue to cooperate with DCFS's recommendations and that a permanency hearing be held within six months.

_____

[7]Hayes indicated that it was her supervisor who made the recommendation that guardianship be granted to DCFS.

14

¶ 38 Thereafter, DCFS submitted an addendum to the dispositional report that indicated as of November 2025, Father saw two providers, a nurse practitioner and a mental health therapist, and was prescribed medication for sleep disruption. In October 2025, he was also prescribed medication for alcohol use disorder to be taken for one month. Finally, a Rosecrance substance abuse assessment dated December 1, 2025, provided that Father "was not recommended [for] substance abuse services and was advised to return should any changes arise."

¶ 39 The trial court ultimately found it in the best interests of the minors to be made wards of the court and adjudged neglected due to their exposure to substance abuse and the effects of Father's mental illness. The court, however, found that Father and Mother were fit, able, and willing to exercise custody and guardianship of the minors. The court ordered Father and Mother to fully cooperate with DCFS and the court appointed special advocate (CASA), comply with all service plans, and correct the conditions that required the minors to be adjudged wards of the court. The court entered its written dispositional order on March 3, 2026.

¶ 40 This appeal followed.

¶ 41                                     II. ANALYSIS

¶ 42 Father argues on appeal that the trial court's finding that it was in the best interests of the minors to be made wards of the court was against the manifest weight of the evidence. The Juvenile Court Act sets forth a two-step process to determine whether minors should be made wards of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step involves an adjudicatory hearing at which the trial court determines whether the allegations in the petition that the minors are abused or neglected are supported by a preponderance of the evidence. *Id.* ¶ 19. "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.T.*, 361 Ill. App. 3d 187, 200 (2005). At this stage of the proceedings,

15

the focus is on whether the minors are neglected, not whether the parents are neglectful. *In re Z.L.*, 2021 IL 126931, ¶ 59.

¶ 43 If the trial court finds neglect by a preponderance of the evidence, the court then moves to step two, where it conducts a dispositional hearing to determine whether it is consistent with the health, safety, and best interests of the minors to be made wards of the court. *Id.* ¶ 60. "At this point, the trial court may consider the acts and/or omissions of the parents." *Id.* "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather,

> "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.* (quoting *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)).

¶ 44 A trial court's finding of neglect is afforded significant deference and will not be disturbed on appeal unless it is against the manifest weight of the evidence, *i.e.*, only when the opposite conclusion is clearly evident or when the court's ruling is unreasonable, arbitrary, and not based on the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004); *In re Angela P.*, 2022 IL App (1st) 211092, ¶ 45. After reviewing the record in this case, we cannot say the trial court's finding that the minors were neglected due to an injurious environment was against the manifest weight of the evidence.

¶ 45 Section 2-3(1)(b) of the Juvenile Court Act provides that a neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2024). Neglect is generally defined as the failure to exercise the care that

16

circumstances justly demand, and it encompasses both willful and unintentional disregard of parental duty. *In re K.T.*, 361 Ill. App. 3d 187, 200 (2005). Since the term has no fixed meaning, neglect is determined based on the specific circumstances of each case. *Id.* Likewise, an injurious environment "is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Id.* at 200-01. In any proceeding under the Juvenile Court Act, the paramount consideration is the best interest of the minors. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 46 In making a "best interest" determination, courts shall consider the following factors:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

17

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

Additionally, courts may consider the minors' relationship with their present caretaker, including the nature and length of that relationship, and the effect that a change in placement would have on the minors' emotional and psychological well-being. *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004). The trial court, however, need not articulate any specific rationale for its decision, and we may affirm the court's decision without relying on any basis used by the court below. *Id.*; *In re Jaron Z.*, 348 Ill. App. 3d 239, 263 (2004).

¶ 47 Here, the minors were adjudicated neglected based on an injurious environment after police were called on multiple occasions for incidents involving Father's mental health and/or their parents' substance abuse when the minors were present. As set forth above, police were called to the minors' home on November 9, 2024, for Father's attempted suicide. Several witnesses, including Mother and Father's adult daughter, Olyvia, two police officers, Mother, and Father, testified largely consistently regarding the attempted suicide. Their combined testimony revealed that Father and Mother had been drinking heavily and that Father had attempted to hang himself in the basement in the presence of the minors. R.H. tried to cut Father down, but was unable to do so, leading Father to grab "the knife out of [R.H.'s] hand and cut himself down."

18

¶ 48 Moreover, Mother sustained visible injuries from the incident, including bruises around her eyes and one on her hand. A third police officer, Sergeant Gregg, testified that he spoke to Mother the night of the alleged suicide attempt wherein she claimed that Father had a PTSD episode and provided conflicting statements as to whether Father had hit her. Specifically, she told Officer Gregg that Father had not assaulted her, even though she told other officers that he had earlier in the day. The combined testimony further revealed that Father had suffered from PTSD and other mental health issues for a number of years. Testimony from Olyvia and a DCFS investigator, Marshbanks, also revealed that Father had struggled with substance abuse, namely, alcohol, marijuana, and, on occasion, cocaine. Father even admitted as much.

¶ 49 Additionally, police were called to the Meijer's store in Champaign the following summer for a shoplifting incident involving Father, his brother, and a female. At some point, Father approached the store's manager, Myers, yelling and screaming. Father then allegedly punched Myers in the face, knocking his glasses off. According to Myers, video footage revealed that children were present during the incident. Father was involved with police again when he was ticketed for illegally transporting alcohol in his car on February 9, 2026, the day before he testified in this matter. The minors were present during that incident.

¶ 50 The foregoing demonstrates that Father and Mother failed to exercise the care that circumstances justly demand. Even if it was unintentional, they disregarded their parental duty by allowing the minors to be exposed to Father's mental health struggles, as well as his substance abuse problems. These issues were not isolated to his November 9, 2024, suicide attempt. As stated, Father was involved with police at least two other times following that incident. The minors were present on at least one of those occasions. Father and Mother's failure to provide the minors

with a safe and nurturing shelter by exposing them to these incidents was neglectful and amounted to a breach of their parental duty.

¶ 51 Father, nonetheless, argues that since those incidents, he has corrected the conditions that required the minors to be adjudged wards of the court by receiving mental health therapy and treatment. Additionally, he and Mother have fully cooperated with DCFS and engaged in all referred services. They are both college-educated and able to meet their family's financial needs, including adequate food, clothing, and shelter. Moreover, the minors had no concerns about living with their parents and felt loved and supported by them.

¶ 52 While we agree that Father and Mother have taken steps toward correcting the conditions that led to the trial court's neglect finding, we cannot say the court's ruling making the minors wards of the court and ordering their parents to cooperate with DCFS and CASA and comply with all service plans, was unreasonable, arbitrary, or not based on the evidence. As set forth, the evidence showed a pattern of mental health and substance abuse issues that continued after Father's November 9, 2024, suicide attempt. We acknowledge that a December 1, 2025, substance abuse assessment from Rosecrance indicated that Father "was not recommended [for] substance abuse services and was advised to return should any changes arise." However, following that report, Father was ticketed, in the presence of the minors, for having "two empty beer cans" in his car. That incident occurred the day before he testified in this matter.

¶ 53 Furthermore, Father's continuous positive drug screening results, despite Mother's negative results, proved to be a concern for DCFS and the lower court. To the extent Father was being treated by the VA for these issues, there was very little evidence presented concerning his progress other than he was seeing two providers and was prescribed medication for sleep disruption, and, at one point, alcohol use disorder. Regardless, given the minors' repeated exposure

20

to mental health and substance abuse issues by one or both parents, we conclude that the trial court properly found them neglected based on an injurious environment. As the evidence in the record shows that the court's determination to make the minors wards of the court, while allowing custody and guardianship to stand with their parents, was consistent with the health, safety, and best interests of the minors, we affirm that decision.

¶ 54                                              III. CONCLUSION

¶ 55     For the foregoing reasons, we affirm the trial court's February 10, 2026, adjudicatory order and its March 3, 2026, dispositional order.

¶ 56     Affirmed.